Filed 12/2/24  P. v. Bailey CA4/3

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION THREE

THE PEOPLE,

    Plaintiff and Respondent,

        v.

MICHAEL DOUGLAS BAILEY,

    Defendant and Appellant.

G062562

(Super. Ct. No. 20CF2594)

O P I N I O N

        Appeal from a judgment of the Superior Court of Orange County, Lance P. Jensen, Judge. Affirmed.

        Patrick Morgan Ford for Defendant and Appellant.

        Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Charles C. Ragland, Assistant Attorney General, Christopher P. Beesley and Michael J. Patty, Deputy Attorneys General, for Plaintiff and Respondent.

Defendant Michael Douglas Bailey was convicted by a jury of committing a forcible lewd act on a child under 14 years of age (Pen. Code, § 288, subd. (b)(1) [count 1]) and aggravated sexual assault (oral copulation) on a child under 14 years of age (Pen. Code, § 269, subd. (a)(4) [count 2]). The trial court sentenced Bailey to 15 years to life in prison.[1]

On appeal, Bailey makes five arguments: (1) the trial court erred by admitting evidence pursuant to Evidence Code sections 1101, subdivision (b),[2] and 1108 that Bailey inappropriately touched another child, C.M., on multiple occasions, (2) the court incorrectly instructed the jury regarding section 1108 by failing to specify the elements of the uncharged crime(s) Bailey allegedly committed against C.M. and by erroneously referring at the outset of the instruction to "charged" rather than "uncharged" offenses, (3) during closing argument, the prosecutor repeatedly mischaracterized the nature and origin of Bailey's DNA found on the victim's penis, thereby depriving Bailey of due process and a fair trial, (4) Bailey's sentence was cruel and/or unusual under the California and federal Constitutions, and (5) the cumulative impact of these errors requires reversal of the judgment. We find no reversible error and affirm the judgment.

STATEMENT OF FACTS AND PROCEDURAL HISTORY

*A. Circumstances Surrounding the Charges*

On the evening of August 24, 2020, Bailey followed M.T., a 12-year-old boy, into the bathroom of Bailey's small studio apartment, locked the

---

[1] The court imposed the sentence of 15 years to life for count 2 and stayed imposition of sentence on count 1 pursuant to Penal Code section 654.

[2] All further statutory references are to the Evidence Code unless otherwise indicated.

door behind him, pushed M.T. up against a wall, pulled M.T.'s shorts down, got on his knees and, while pinning the boy's wrists against the wall, orally copulated M.T. for about one to two minutes. Bailey was 30 years old, about six feet two inches tall and weighed approximately 250 pounds. M.T. was about four feet tall and weighed between 80 and 100 pounds. M.T. could not move his wrists or break away during the incident because Bailey was stronger and was forcing M.T.'s wrists against the wall. M.T. told Bailey to stop, but Bailey would not. Two of M.T.'s friends, who were present in Bailey's apartment at the time, were banging on the outside of the bathroom door. They peered under the door and saw Bailey on his knees. Bailey eventually stood up, M.T. pulled his shorts up, and they both exited the bathroom. M.T. immediately told his friends (who at that point were sitting on Bailey's bed) what had happened.[3] M.T. became angry and started throwing Bailey's things. Bailey then told M.T. he was sorry and asked M.T., "Will you forgive me?" M.T. responded, "No. I hope you move out of the apartments."

Within two or three minutes, M.T. left Bailey's apartment and returned to his own apartment, where he talked to his 15-year-old sister. M.T. appeared sad and was tearing up and asked his sister if someone could lose their virginity if another person sucks on their penis. M.T. then told his sister that Bailey had "sucked on him, on his [penis]" and asked her to tell their mother. Later that same day, M.T. also told his older brother what had happened.

---

[3] M.T. and his family lived in the same apartment complex as Bailey, and M.T. went to Bailey's apartment once or twice a week with one or more of his friends.

Later that evening, M.T. and his sister went to Bailey's apartment together. M.T.'s sister confronted Bailey about what M.T. told her and asked Bailey if he had "sucked on my brother's [penis]." In response, Bailey told her he "might have taken things too far," and that his "head" "might have touched [M.T.'s penis]." M.T.'s older brother also confronted Bailey that evening, and Bailey told him he did not know what happened. M.T. spoke to the police that same evening.

The police took a DNA swab sample from M.T.'s penis the night of the incident and a reference DNA sample from Bailey. Nucleated epithelial cells were observed on the penile sample taken from M.T., which could indicate contact with a mucous membrane such as saliva. The penile sample also contained a low level of amylase, which is an enzyme found in saliva. There was "very strong" scientific support that Bailey was a contributor to the sample.

Bailey testified at trial. He admitted he went into the bathroom while M.T. was in there alone and then closed and locked the door behind him. He admitted he got down on one or both knees "to [M.T.'s] level" facing M.T., but said it was only so he could talk to him and that he was surprised to notice that M.T.'s penis was out of his pants. Bailey denied putting his mouth on M.T.'s penis and testified he only knelt down so that he could look M.T. in the eye while speaking to him. He testified that, when M.T.'s sister confronted him about whether he had sucked on M.T.'s penis, Bailey told her that, "all of a sudden [M.T.'s] penis was in front of my face," or something to that effect. Bailey admitted telling a few people—including M.T.'s sister and brother—that he did not know what had happened.

According to M.T., the incident in the bathroom was not the only time Bailey had inappropriately touched him. When M.T. and some of his

4

friends would watch television at Bailey's apartment, Bailey would touch M.T. by putting his hands on M.T.'s "penis and [his] butt," both on top of and under his clothing, including touching M.T.'s penis skin to skin. This happened every time M.T. went to Bailey's apartment, which M.T. estimated to be more than 30 times. Bailey would do this when the other boys were not looking. While Bailey was touching M.T. on his penis, Bailey would whisper to M.T. things like, "you have a nice penis" and "you have a nice cock." When M.T. would try to get up and move, Bailey would put his hand on his chest to keep him from moving. One time, before Bailey purchased a skateboard for M.T., Bailey asked him, "if I get this for you, can I suck your penis?"

*B. Evidence of Uncharged Conduct as to C.M.*

Prior to trial, Bailey moved in limine to exclude evidence relating to C.M., an 11-year-old boy who frequently visited Bailey's apartment with M.T. and other children. The trial court denied the motion based on its preliminary finding that the proffered evidence, which came from a CAST interview of C.M.,[4] was admissible under section 1108, and also under section 1101, subdivision (b), to prove intent. The court further found the evidence regarding C.M. was not inadmissible under section 352 because it was more probative than prejudicial, would be limited at trial, and would not result in an undue consumption of time. The court left open the possibility that the parties could revisit the ruling during trial, depending on how the evidence developed.

---

[4] A CAST interview is a forensic interview of an alleged crime victim or witness conducted by a senior social worker to attempt to obtain information about what occurred on a particular occasion involving alleged sexual misconduct.

At trial, C.M. testified that, although it was common for Bailey and him to engage in a little bit of wrestling from time to time, Bailey touched him in a way that made him feel uncomfortable at the beach during C.M.'s 11th birthday celebration. Specifically, Bailey grabbed C.M. on the inner part of his thigh, about four to six inches from his penis. They were playing with a ball at the time, and Bailey was trying to pick him up. C.M. pushed Bailey off and walked away. This happened twice that day at the beach when they were both standing in water that came up to C.M.'s navel.

C.M. testified that, on another occasion, when C.M. and Bailey were in Bailey's apartment watching a movie on Bailey's bed, Bailey put his hand on the outside of C.M.'s thigh, this time closer to C.M.'s knee, and "tried to get, like, deeper into [C.M.'s] thigh." Bailey was moving his hand from the outside of C.M.'s thigh to the inside and up. C.M. pushed him off and moved to the couch because he felt uncomfortable.

DISCUSSION

I.

ADMISSIBILITY OF PRIOR UNCHARGED ACTS RELATING TO C.M.

Bailey contends it was prejudicial error for the trial court to admit the evidence of the three incidents involving C.M. (two in the water at the beach and one in Bailey's apartment). Specifically, Bailey contends the touching and grabbing of C.M.'s thighs did not qualify as a prior sexual offense that could be admissible under section 1108; the acts were not similar enough to the charged conduct to make them admissible under section 1101, subdivision (b); the acts were not admissible to prove his intent because Bailey did not dispute the intent element of the prosecution's case, but rather focused only on whether he committed the acts at all; and the evidence should have been excluded under section 352. We conclude the trial court

6

properly admitted the evidence under section 1108 and did not err by refusing to exclude it under section 352.

Section 1108, subdivision (a), makes evidence of the defendant's commission of another sexual offense admissible in any criminal case charging the defendant with the commission of a sexual offense, subject to section 352.[5] A "sexual offense" under section 1108 includes "a crime under the law of a state or of the United States that involved" (*id.*, subd. (d)(1)) among other things, "[a]ny conduct proscribed by [Penal Code] Section . . . 288" (*id.*, subd. (d)(1)(A)) and includes an attempt to engage in such conduct (*id.*, subd. (d)(1)(F)). Prior to trial, the trial court heard arguments from counsel and requested an offer of proof regarding what evidence the prosecution intended to introduce at trial pursuant to section 1108 regarding uncharged sexual offenses committed by Bailey. The first piece of evidence the court discussed with counsel was unrelated to C.M.—a photograph of Bailey lying in a hammock with two young boys on top of him. When discussing the photograph, the trial court asked the prosecutor to

---

[5] "[T]he 'Legislature has determined that the policy considerations favoring the exclusion of evidence of uncharged sexual offenses are outweighed in criminal sexual offense cases by the policy considerations favoring the admission of such evidence. The Legislature has determined the need for this evidence is "critical" given the serious and secretive nature of sex crimes and the often resulting credibility contest at trial. . . .' [Citations.] [¶] Accordingly, when a defendant is charged with a sexual offense, evidence of his or her uncharged sexual misconduct is no longer subject to the general prohibition against character evidence. [Citation.] 'With the enactment of [Evidence Code] section 1108, the Legislature "declared that the willingness to commit a sexual offense is not common to most individuals; thus, evidence of any prior sexual offenses is particularly probative and necessary for determining the credibility of the witness."'" (*People v. Yovanov* (1999) 69 Cal.App.4th 392, 403–404, fn. omitted.)

identify the "sexual offense under [section] 1108." Bailey's counsel argued that, as to the photograph, there was no evidence of any "inappropriate touching" or any "lewd intent" on Bailey's part. The prosecutor specifically mentioned Penal Code section 288, subdivision (a). The court excluded the photograph from evidence.

As to C.M.'s testimony, however, the trial court noted the offer of proof showed Bailey either touched, or attempted to touch, C.M. near his groin area. The court found this sufficient to admit the evidence under section 1108 and that it was not rendered inadmissible under section 352. However, the court informed counsel its ruling was without prejudice to revisiting it during trial if requested by Bailey's counsel.

Although neither the trial court nor the prosecutor specified the crime allegedly committed as to C.M., when considering the entire hearing in context and the discussions between counsel and the court regarding the photograph that preceded the discussion regarding C.M., it is clear the court knew section 1108 required evidence of another sexual offense and concluded the offer of proof as to C.M. was sufficient to show Bailey committed, or attempted to commit, a lewd act on C.M. with the intent to arouse himself, in violation of Penal Code section 288, subdivision (a). We conclude the evidence regarding C.M. was admissible under section 1108.

We also conclude the trial court did not abuse its discretion in finding, pursuant to section 352, that the probative value of the evidence regarding C.M. was not substantially outweighed by "'the probability that its admission [would] (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury.'" (*People v. Nguyen* (2010) 184 Cal.App.4th 1096, 1116.) There is no indication that C.M.'s testimony unduly consumed time during

8

trial.[6] Nor did C.M.'s testimony pose a risk of undue prejudice by inflaming the passions or prejudices of the jury. The conduct C.M. described was far less inflammatory than the things Bailey allegedly did to M.T.

Even assuming, for the sake of argument, the trial court erred in allowing the evidence relating to C.M., the error was harmless. (*People v. Watson* (1956) 46 Cal.2d 818, 836 (*Watson*).) The evidence of Bailey's guilt was substantial. In addition to M.T.'s testimony, two other children who were in Bailey's apartment at the time testified they peered under the door and saw Bailey on his knees behind a locked bathroom door with M.T. Moreover, by Bailey's own admission, he was alone with M.T., behind a locked bathroom door, facing M.T. in a kneeling position while M.T.'s penis was exposed. Bailey apologized to M.T. after they came out of the bathroom and asked M.T. to forgive him. M.T.'s sister testified that when she confronted Bailey that same evening, Bailey admitted his head may have touched M.T.'s penis and that he might have taken things too far.

In addition, there was substantial other uncharged conduct admitted into evidence at trial, to which Bailey's counsel did not object— including M.T.'s testimony that Bailey had touched his penis and buttocks numerous times before the incident—which was far more inflammatory than the other incidents involving C.M. The prosecution also introduced evidence that Bailey would often tickle the children in his apartment and have them sit on his lap, sometimes by force. Based on the totality of the evidence, there is no reasonable probability the jury would have reached a different result

---

[6] Trial testimony took place over a period of three days. C.M.'s testimony took only a portion of one morning session and consumed 49 out of the 571 pages of trial testimony.

had the trial court excluded the evidence regarding C.M. (*Watson, supra,* 46 Cal.2d at p. 836.)[7]

## II.

### CLAIMED INSTRUCTIONAL ERROR

Having concluded Bailey's conduct toward C.M. was admissible under section 1108, we turn to his argument that the jury instruction regarding use of the uncharged offenses to show propensity was erroneous. The prosecution concedes the section 1108 instruction given to the jury—modified CALCRIM No. 1191A—was erroneous in two respects. First, the beginning of the instruction referred to "the crime(s) *charged* in this case" (italics added) rather than the crimes that were *not charged*, i.e., the uncharged sexual offenses that were admissible under section 1108 to show Bailey's propensity to commit the charged crimes. Second, the instruction did not specify the uncharged crime(s) and the elements of those crime(s). Bailey contends that, because of those errors, the instruction "mistakenly informed the jurors that propensity could be established by the *charged conduct*, which the prosecution could establish by a preponderance of the evidence." (Italics added.) Bailey therefore argues the jury instruction effectively lowered the prosecution's burden of proof in violation of his due process rights under the Fourteenth Amendment to the United States Constitution.[8]

---

[7] In light of our conclusion that the evidence regarding C.M. was admissible pursuant to section 1108, we need not decide whether it was also admissible under section 1101, subdivision (b), to prove intent. And in any event, any alleged error was harmless for the reasons explained above.

[8] The due process clause "requires that each element of a crime be proved to a jury beyond a reasonable doubt." (*Hurst v. Florida* (2016) 577 U.S. 92, 97.)

10

As a preliminary matter, the prosecution argues Bailey forfeited his instructional error argument by failing to object to the instruction at trial. We disagree. Where, as here, a defendant contends his substantial rights were affected, we may review an allegedly erroneous instruction absent an objection in the trial court. (Pen. Code, § 1259; *People v. Taylor* (2010) 48 Cal.4th 574, 630, fn. 13.)

We begin with the precise wording of the instructions given to the jury that are pertinent to uncharged conduct and to the applicable burdens of proof. The jury was given the standard instruction on the burden of proof in a criminal trial, CALCRIM No. 220: "The fact that a criminal charge has been filed against the defendant is not evidence that the charge is true. You must not be biased against the defendant just because (he) (has) been arrested, charged with a crime, or brought to trial. [¶] A defendant in a criminal case is presumed to be innocent. This presumption requires that the People prove a defendant guilty beyond a reasonable doubt. Whenever I tell you the People must prove something, I mean they must prove it beyond a reasonable doubt unless I specifically tell you otherwise. [¶] Proof beyond a reasonable doubt is proof that leaves you with an abiding conviction that the charge is true. The evidence need not eliminate all possible doubt because everything in life is open to some possible or imaginary doubt. [¶] In deciding whether the People have proved their case beyond a reasonable doubt, you must impartially compare and consider all the evidence that was received throughout the entire trial. Unless the evidence proves the defendant guilty beyond a reasonable doubt, (he) (is) entitled to an acquittal and you must find (him) not guilty."

The jury also was given CALCRIM No. 375, regarding use of evidence of an uncharged offense against C.M. to prove intent. That

11

instruction said: "The People presented evidence of other behavior by the defendant that was not charged in this case/that the defendant allegedly [touched C.M.] in an inappropriate manner. [¶] You may consider this evidence only if the People have proved by a preponderance of the evidence that the defendant in fact committed the (uncharged offense/act). Proof by a preponderance of the evidence is a different burden of proof than proof beyond a reasonable doubt. A fact is proved by a preponderance of the evidence if you conclude that it is more likely than not that the fact is true. [¶] If the People have not met this burden, you must disregard this evidence entirely. [¶] If you decide that the defendant committed the (uncharged offense/act), you may, but are not required to, consider that evidence for the limited purpose of deciding whether: [¶] The defendant acted with the intent to commit the offenses alleged in this case. [¶] In evaluating this evidence, consider the similarity or lack of similarity between the uncharged (offense/act) and the charged offenses. [¶] Do not consider this evidence for any other purpose except for the limited purpose of determining the defendant's credibility. [¶] If you conclude that the defendant committed the (uncharged offense/act), that conclusion is only one factor to consider along with all the other evidence. It is not sufficient by itself to prove that the defendant is guilty of charges in COUNT 1 and/or 2. *The People must still prove (each) (charge) beyond a reasonable doubt.*" (Italics added.)

Finally, the jury was given a modified version of CALCRIM No. 1191A, entitled "Evidence of Uncharged Sex Offense." The standard, *unmodified* CALCRIM No. 1191A instruction begins by stating: "The People presented evidence that the defendant committed the crime[s] of _____ . . . that (was/were) *not* charged in this case." (Italics added.) But the trial court deleted the critical word "not" from that sentence

12

in both the written instruction and when reading it to the jury.[9] Thus, the modified instruction actually given to the jury read, in full: "The People presented evidence that the defendant committed the *crime(s) charged in this case.* (These crime(s) (are) defined for you in these instructions.[)] [¶] *You may consider this evidence only if the People have proved by a preponderance of the evidence that the defendant in fact committed the uncharged offense(s).* Proof by a preponderance of the evidence is a different burden of proof from proof beyond a reasonable doubt. A fact is proved by a preponderance of the evidence if you conclude that it is more likely than not that the fact is true. [¶] If the People have not met this burden of proof, you must disregard this evidence entirely. [¶] If you decide that the defendant committed the uncharged offense, you may, but are not required to, conclude from that evidence that the defendant was disposed or inclined to commit sexual offenses, and based on that decision, also conclude that the defendant was likely to commit the alleged offenses as charged here. *If you conclude that the defendant committed the uncharged offense, that conclusion is only one factor to consider along with all the other evidence.* It is not sufficient by itself to prove that the defendant is guilty of COUNT 1 and/or 2. *The People must still prove each charge beyond a reasonable doubt.*" (Italics added.)

CALCRIM No. 1191A as given to the jury was erroneous in two respects. First, by substituting the word "charged" for the phrase "not charged" in the first sentence of the instruction, the modified instruction told the jurors the People had "presented evidence that the defendant committed

---

[9] We disagree with the prosecution's characterization of the mistake as a "typographical error"; it is a handwritten interlineation. But how the error made its way into the instruction is not important. What is important is that it was error.

13

the crime(s) *charged in this case*" (italics added) and that "[t]hese crime(s) (are) defined for you in these instructions." By itself, that was not inaccurate. But what came next definitely was: The instruction proceeded to tell the jurors they "may consider this evidence"—i.e., the just-referenced *evidence of the "crime(s) charged in this case"*—"only if the People have proved by a preponderance of the evidence that the defendant in fact committed the *uncharged* offense(s)." (Italics added.)

In other words, the jurors were instructed that before they could even *consider* the evidence of the *charged* offenses, they had to first find (by a preponderance of the evidence) that the defendant had committed the *uncharged* offense or offenses.[10] This, of course, is wrong. The jurors could convict defendant of the *charged* offenses even if they disregarded or found not credible the evidence regarding the *uncharged* offenses. We find this error was not prejudicial, however, as the practical effect of the mistaken wording was to erect an additional hurdle jurors would have to clear before they could find Bailey guilty of the charged offenses: i.e., they would have to first find by a preponderance of the evidence that Bailey committed the *uncharged* offense(s). By itself, this additional hurdle—although patently erroneous— effectively benefitted Bailey.

During the pendency of this appeal, one of our sister courts issued its decision in *People v. Holliday* (2024) 104 Cal.App.5th 536 (*Holliday*), and we asked the parties to brief the effect, if any, of that decision on the acknowledged instructional error as to CALCRIM No. 1191A. After

---

[10] The CALCRIM No. 375 instruction made clear the uncharged conduct was defendant "allegedly [touching C.M.] in an inappropriate manner."

14

reviewing both parties' supplemental briefs, we conclude *Holliday* is distinguishable and does not require reversal.

In *Holliday*, two codefendants were each charged with three separate "assaultive incidents" that occurred over the course of several months: the first in Pacific Beach, the second in Chula Vista, and the third in the Gaslamp District of San Diego. (*Holliday, supra*, 104 Cal.App.5th at p. 540.) The trial court instructed the jury they could use the first two *charged* offenses in considering whether (under section 1101, subdivision (b)), defendant acted with the requisite intent to steal from the victims in this case, and it gave a modified CALCRIM No. 375 instruction to address the propensity evidence. (*Holliday, supra,* at pp. 546–548.) But the modified instruction never "actually explained to the jury that it was intended to guide the jury's use of evidence of one charged crime in determining the defendants' guilt of another charged crime." (*Id.* at p. 555.) Instead, the instruction "merely stated that the People had presented evidence of 'other offenses that were charged in this case'" and stated "if those offenses were proven by a preponderance of the evidence, the jury could consider them to decide whether '[t]he defendant acted with the intent to steal *from victims in this case.*'" (*Ibid.*) The appellate court therefore concluded "the jury could reasonably have understood that the instruction allowed it to use a preponderance standard in deciding whether evidence of the charged Pacific Beach crimes proved the defendants acted with an intent to steal *from the victims in the Pacific Beach crimes*—and likewise for the Chula Vista crimes. This effectively lowered the prosecution's burden of proving intent to steal beyond a reasonable doubt as an essential element of the charged robbery and conspiracies to commit robbery." (*Ibid.*) The *Holliday* court concluded the error was "reversible per se and requires automatic reversal" (*id.* at p. 557)

15

because it lowered the prosecution's burden of proving guilt beyond a reasonable doubt and therefore was structural error (*ibid*.).

In his supplemental brief, Bailey contends that, as in *Holliday*, the error in the modified CALCRIM No. 1191A instruction given to the jurors here muddled the burdens of proof that apply to the charged offenses and the uncharged offenses and, effectively, "mistakenly informed the jurors that propensity could be established by the *charged* conduct" and that the prosecution need only prove the charged conduct by a preponderance of the evidence. We disagree. The facts and instructions at issue here differ markedly from those in *Holliday*. The prosecution was not seeking to use a charged offense to show Bailey's propensity to commit other charged crimes, so there was no danger the jury would be confused by having to apply different burdens of proof to the same conduct, depending on whether the conduct was being used as propensity evidence for another charged offense or as the basis of a charged offense. The jurors were instructed they could use an uncharged offense (if it were proved by a preponderance of the evidence) to show defendant's propensity to commit the charged offenses, which "[t]*he People must still prove . . . beyond a reasonable doubt*." (Italics added.) The instructions did not confuse the burdens of proof or suffer from the vagueness and confusion that characterized the modified CALCRIM No. 375 instruction in *Holliday*.

"""In determining whether error has been committed in giving or not giving jury instructions, we must consider the instructions as a whole [and] assume that the jurors are intelligent persons and capable of understanding and correlating all jury instructions which are given.""" (*People v. Ramos* (2008) 163 Cal.App.4th 1082, 1088.) A fair reading of all the instructions, taken together, makes clear the preponderance standard

16

applied only to whether the *uncharged* offenses had occurred. The jury was told in CALCRIM No. 220 that defendant is presumed innocent, and the People would have to prove the defendant "guilty beyond a reasonable doubt" of the charges against him. The same instruction explained what "beyond a reasonable doubt" means.

The jurors were instructed in CALCRIM No. 375 that the People had presented evidence of "other behavior by the defendant that was not charged in this case" (specifically, that Bailey allegedly "touch[ed C.M.] in an inappropriate manner"), and that they could consider that evidence only to decide whether Bailey acted with the intent to commit the charged offenses, and "only if the People have proved by a preponderance of the evidence that the defendant in fact committed the (uncharged offense/act)." The instruction explained that "[p]roof by a preponderance of the evidence is a different burden of proof than proof beyond a reasonable doubt." And it told the jurors that even if they found that defendant committed the *uncharged* offenses, "[i]t is not sufficient by itself to prove the defendant is guilty of charges in COUNT 1 and/or 2. *The People must still prove (each) (charge) beyond a reasonable doubt.*" (Italics added.)

The modified CALCRIM No. 1191A instruction reiterated that "[p]roof by a preponderance of the evidence is a different burden of proof from proof beyond a reasonable doubt." And it again instructed the jurors that if they were to conclude "that the defendant committed the *uncharged* offense, that conclusion is only one factor to consider along with all the other evidence. It is not sufficient by itself to prove that the defendant is guilty of COUNT 1 and/or 2. *The People must still prove each charge beyond a reasonable doubt.*" (Italics added.)

17

We conclude the instructions identifying the burden of proof that applied to the charged offenses and the burden of proof that applied to the uncharged offenses were clear considering the entirety of the instructions, and we presume the jury followed them. (*People v. Ramos, supra*, 163 Cal.App.4th at p. 1088.) We find no constitutional violation.

This brings us to the second error in the modified CALCRIM No. 1191A instruction: the failure to specify what the asserted uncharged sex offense(s) relating to C.M. were. The prosecution acknowledges that this, too, was error. We agree. The CALCRIM No. 1191A instruction made clear the prosecutor was asserting Bailey had committed one or more uncharged sex offenses, from which the jury could conclude he was disposed or inclined to commit sexual offenses and therefore was likely to commit the charged offenses. The instruction also made clear that, for the jury to consider the uncharged offenses, the prosecution would have to prove by a preponderance of the evidence that Bailey actually committed the uncharged offenses. But the trial court never told the jury what the uncharged offenses were, much less instructed the jury on the elements necessary to prove the uncharged offenses. Thus, the jury was given no guidance on how to evaluate and determine whether Bailey had, in fact, committed any uncharged offense against C.M.

The question then becomes whether this error was prejudicial. We apply the *Watson* standard to determine "whether there is a reasonable probability the jury might have reached a different result had it been instructed correctly." (*People v. Hendrix* (2022) 13 Cal.5th 933, 948; see *Watson, supra*, 46 Cal.2d at pp. 836–837.)

We do not dismiss the errors in the modified CALCRIM No. 1191A instruction as trivial. The jurors were instructed that, in determining

18

whether the People had proved the charged offenses, they could consider, as one factor, whether Bailey had committed some unidentified, undefined, uncharged crime (or crimes) against C.M. and therefore had a propensity to commit sexual offenses. But the jurors were given no information with which to make that determination. Without knowing what the uncharged offenses were—or what elements were required to prove them—the jurors were left to evaluate the "uncharged offense(s)" with literally no guidance. They effectively were left to figure it out on their own.

If the evidence against Bailey were weak or equivocal, we might well conclude this constituted prejudicial error. But the evidence on the charged offenses was extremely strong, if not overwhelming. By his own admission, Bailey entered the bathroom knowing M.T. was there, locked the door behind him, and was on his knees in front of M.T. After the encounter was over, M.T. emerged from the bathroom angry and began throwing things. M.T. immediately told his friends what had happened, and Bailey promptly apologized to M.T. and asked him for forgiveness. And M.T. testified this was not the first time Bailey had touched him inappropriately; Bailey had touched him on his penis and buttocks on multiple prior occasions. The jury was entitled to believe M.T.'s version of events—and it clearly did—and to draw the conclusion that Bailey's apology and request for forgiveness immediately after exiting the bathroom was consistent with M.T.'s description of what transpired behind the locked door. Moreover, M.T. promptly told both his sister and his brother what happened. When Bailey was confronted by M.T.'s sister about what happened, he responded he "might have taken things too far." And, of course, there is the evidence of Bailey's DNA on M.T.'s penis. Although Bailey offered an alternative hypothesis for how his DNA theoretically might have ended up on M.T.'s

19

penis, the jury was entitled to reject his hypothetical explanation as not credible.

In sum, on this record, we conclude it is not reasonably probable the jury would have reached a result more favorable to Bailey if the errors in CALCRIM No. 1191A had not been made.

III.

CLAIM OF PROSECUTORIAL ERROR[11]

Bailey contends the prosecutor misrepresented during closing argument the DNA evidence found on M.T.'s penis and that this constituted prosecutorial error that deprived him of a fair trial. We agree the prosecutor overstated the expert's testimony regarding the DNA evidence—or at the very least focused exclusively on the potentially most inculpatory possibilities or interpretations supported by that testimony. But we do not agree the prosecutor's arguments deprived Bailey of a fair trial.

During closing argument, the prosecutor repeatedly stated the DNA found in the penile sample taken from M.T. came from saliva from Bailey's mouth. While this was one possibility, the expert's testimony on that point was not definitive. The DNA expert testified that Bailey's DNA did not necessarily come directly from *saliva* from Bailey's mouth, but instead could have come from another source, such as a transfer of Bailey's DNA from nasal mucus or bacteria. As Bailey's attorney established on cross-examination of the DNA expert, it was theoretically possible that Bailey

---

[11] We use the phrase prosecutorial error rather than prosecutorial misconduct because prosecutorial misconduct "'is somewhat of a misnomer to the extent that it suggests a prosecutor must act with a culpable state of mind. A more apt description of the transgression is prosecutorial error.'" (*People v. Centeno* (2014) 60 Cal.4th 659, 666–667.)

could have wiped his nose with his hand, thereby depositing mucus from his nose onto his hands, then transferred that DNA to M.T. when they "high five[d]" at the door when M.T. arrived at the apartment, and M.T. then could have transferred Bailey's DNA from M.T.'s hand to his own penis when he urinated. Moreover, the sample taken from M.T.'s penis showed a low level of amylase, which could have come from saliva, but could have come from another bodily fluid or bacteria.

We conclude that, by arguing only the most incriminating inferences supported by the DNA evidence—without reminding the jury that the DNA evidence could support an alternative, exculpatory scenario—the prosecutor did not engage in prosecutorial error.

"'The standards governing review of misconduct claims are settled. "A prosecutor who uses deceptive or reprehensible methods to persuade the jury commits misconduct, and such actions require reversal under the federal Constitution when they infect the trial with such "'unfairness as to make the resulting conviction a denial of due process.'"'"" (*People v. Gonzales* (2012) 54 Cal.4th 1234, 1275.) Prosecutors may make vigorous arguments and fairly comment on the evidence; they have broad discretion to argue inferences and deductions from the evidence to the jury. (*People v. Sandoval* (2015) 62 Cal.4th 394, 439.) A prosecutor does not commit error by fairly commenting on the state of expert testimony. (*People v. Parson* (2008) 44 Cal.4th 332, 368.) The possibility that Bailey's DNA ended up on M.T.'s penis by some means other than contact with Bailey's mouth was raised as a hypothetical posed to the DNA expert by defense counsel. The prosecutor was entitled to advance his theory of how Bailey's DNA was deposited on M.T.'s penis, which could fairly be inferred from the evidence, and to vigorously attack the defense's theory as unsound or

unbelievable. (*People v. Peoples* (2016) 62 Cal.4th 718, 797.) In addition, Bailey's counsel objected to the prosecutor's argument on this issue, and the trial court cautioned the jury that counsel's argument is not evidence and that they should consider only the evidence itself in reaching its decision. "We 'credit jurors with intelligence and common sense' [citation] and presume they generally understand and follow instructions [citation]." (*People v. McKinnon* (2011) 52 Cal.4th 610, 670.)

Further, in his own closing argument, Bailey's counsel had a full and fair opportunity to remind the jury of the full range of factual scenarios supported by the DNA expert's testimony and to point out why the prosecutor's argument was inaccurate. He availed himself of that opportunity. Bailey's counsel reminded the jury of the DNA expert's testimony that the amount of amylase in the penile sample was so small the expert could not determine where it came from, that it could have come from something other than saliva, and that it could have been transferred (from Bailey's hand to M.T.'s hand and then to M.T.'s penis), rather than coming directly from Bailey's mouth. Bailey's counsel told the jury, "[W]hen [the prosecutor] told you this morning that Mr. Bailey's saliva was found on the penile sample, that is not true. [The expert] never said that the saliva was on there. . . . So don't get caught up in the argument that saliva was found on this young man's penis. [¶] Secondly, it was argued this morning that Mr. Bailey's, quote, mouth cells were found on M.T.'s penis. That's not what [the expert] told us yesterday. . . . She said that they were nucleated epithelial cells that could have come from saliva, could have come from secondary transfer, from nose discharge or from some other bodily fluids. . . . If you don't believe me, ask for [a] read back of the testimony because I am right about that."

22

Even assuming, for the sake of argument, the prosecutor's argument rose to the level of prosecutorial error, we do not find it to be prejudicial. "'When a claim of misconduct is based on the prosecutor's comments before the jury, "'the question is whether there is a reasonable likelihood that the jury construed or applied any of the complained-of remarks in an objectionable fashion.'"'" (*People v. Gonzales*, *supra*, 54 Cal.4th at p. 1275.) We do not find that standard is met here. Even without the DNA evidence, there was overwhelming evidence that Bailey orally copulated M.T., including Bailey's own testimony that he locked himself in the bathroom with M.T. and then knelt in front of M.T. while M.T.'s penis was exposed; M.T.'s testimony Bailey forcibly restrained him and orally copulated him; Bailey's immediate apology to M.T.; Bailey's statements when he was confronted with the accusations that evening; and M.T.'s conduct and prompt reporting of the incident.

## IV.

### SENTENCING

Bailey asserts the mandatory sentence of 15 years to life for count 2, aggravated sexual assault by oral copulation of a 12-year-old child, was cruel and/or unusual punishment pursuant to the California and federal Constitutions.[12] We disagree.

*A. Governing Law and Standard of Review*

The Eighth Amendment to the United States Constitution, which applies to the states (*People v. Caballero* (2012) 55 Cal.4th 262, 265, fn. 1),

---

[12] Pursuant to Penal Code section 269, any person who commits forcible oral copulation of a child under the age of 14 and seven or more years younger than the defendant (*id.*, subd. (a)(4)) "shall be punished by imprisonment in the state prison for 15 years to life" (*id.*, subd. (b)).

prohibits the infliction of "cruel and unusual" punishment. (U.S. Const., 8th Amend.) Article I, section 17 of the California Constitution prohibits the infliction of "[c]ruel *or* unusual punishment." (Italics added.) Although the distinction in wording between the two constitutional provisions is "purposeful and substantive rather than merely semantic" (*People v. Carmony* (2005) 127 Cal.App.4th 1066, 1085), it does not control our analysis or the result here. Both clauses "prohibit punishment that is 'grossly disproportionate' to the crime or the individual culpability of the defendant." (*People v. Mendez* (2010) 188 Cal.App.4th 47, 64; see *People v. Palafox* (2014) 231 Cal.App.4th 68, 82 ["touchstone in each is gross disproportionality"].) We conclude, under either test, Bailey's sentence was not constitutionally infirm.

Under California law, ""[a] tripartite test has been established to determine whether a penalty offends the prohibition against cruel [or] unusual punishment. First, courts examine the nature of the offense and the offender, 'with particular regard to the degree of danger both present to society.' Second, a comparison is made of the challenged penalty with those imposed in the same jurisdiction for more serious crimes. Third, the challenged penalty is compared with those imposed for the same offense in other jurisdictions. [Citations.] In undertaking this three-part analysis, we consider the 'totality of the circumstances' surrounding the commission of the offense."" (*People v. Sullivan* (2007) 151 Cal.App.4th 524, 569.) "The weight afforded to each prong may vary by case," and "'[d]isproportionality need not be established in all three areas'" to demonstrate that a sentence is cruel or unusual. (*People v. Baker* (2018) 20 Cal.App.5th 711, 723 (*Baker*).)

Because a determination of the appropriate sentence for any particular crime falls squarely within the discretion of the Legislature, we generally defer to the Legislature's broad authority in this area. "The

24

doctrine of separation of powers is firmly entrenched in the law of California, and a court should not lightly encroach on matters which are uniquely in the domain of the Legislature. Perhaps foremost among these are the definition of crime and the determination of punishment." (*People v. Wingo* (1975) 14 Cal.3d 169, 174.) Consequently, a defendant arguing that his penalty is cruel and unusual must overcome a "considerable burden." (*Ibid.*) "Only in the rarest of cases could a court declare that the length of a sentence mandated by the Legislature is unconstitutionally excessive." (*People v. Martinez* (1999) 76 Cal.App.4th 489, 494.)

Whether the sentence imposed constitutes cruel and/or unusual punishment presents a question of law, which we review independently, "but underlying disputed facts must be viewed in the light most favorable to the judgment." (*People v. Palafox, supra*, 231 Cal.App.4th at p. 82.)

B. *Nature and Dangerousness of Offense and Offender*

In support of his contention that the 15 years to life sentence imposed on him is cruel and/or unusual, Bailey points out he had no prior accusations of sexual misconduct against him, there was only a "single accusation," and he was examined by a defense expert who opined he did not have any unnatural sexual interest in children. He further argues his diagnosis of autism made him more comfortable in the presence of children than adults, he always demonstrated kindness to children and their families, and the trial court seemed to express frustration with its inability to impose a lesser sentence and even commented on Bailey's good character aside from the conduct that led to his conviction. Bailey also argues the accusations against him were "unlikely" and "devastated [his] life." Finally, he argues

25

state prison will be far worse for an autistic man convicted of a sexual offense against a child than for a person without autism.

Bailey relies on *In re Rodriguez* (1975) 14 Cal.3d 639, in which the court determined punishment was excessive where the defendant's "conduct was explained in part by his limited intelligence, his frustrations brought on by intellectual and sexual inadequacy, and his inability to cope with these problems." (*Id.* at pp. 655–656.) *In re Rodriguez* involved a single instance of externally fondling a young girl's genital area. The facts here are notably different from those in *In re Rodriguez*. Although Bailey had been diagnosed with Level 1 autism,[13] nothing in the record indicates he has a low IQ or was incapable of understanding the significance of his actions. Bailey lived on his own, was able to communicate, spoke another language (Japanese), had attended college, was employed, and, according to an autism expert retained by the defense to evaluate Bailey, seemed to be doing well. There was no evidence Bailey's conduct was caused by confusion, an impaired mental state, miscommunication, or some other possibly mitigating circumstance. Further, Bailey was 30 years old and orally copulated a 12-year-old boy by use of force, pinning the child's wrists up against the wall and preventing him from breaking free. Bailey was far bigger and stronger than M.T., who was tiny in comparison to Bailey. Bailey had engendered the child's trust by befriending him, buying him gifts, and providing M.T. and his

---

[13] According to a child and family psychiatrist called by the defense at trial, individuals with Level 1 autism like Bailey speak well, usually do well academically, but still have a lot of difficulty maintaining relationships or just functioning the way a typical adult might. Although they may have difficulty accurately reading and responding to the social cues of others and difficulty expressing themselves socially, they do not necessarily require support in the form of one-on-one aides or the like.

friends a place in Bailey's apartment to play video and card games and to watch television. M.T. also testified Bailey molested him prior to the charged incident more than 30 times, by touching his penis both over and under his clothing. All this is a far cry from the facts of *In re Rodriguez.*

In *Baker, supra,* 20 Cal.App.5th 711, the court rejected arguments like those made by Bailey here. The defendant in *Baker* was the 50-year-old uncle of his six-year-old victim. While visiting the victim's family, the defendant brought the victim into bed with him, rubbed her stomach, pulled down her underwear, touched her vagina, orally copulated her, and kissed her mouth. (*Id.* at pp. 716–717, 725.) Even though the trial court had expressed its view that the sentence was disproportionate to the crime committed and encouraged the defendant to appeal the conviction, the appellate court held that the indeterminate 15 years to life sentence imposed on the defendant for oral copulating a victim under the age of 10 was not cruel or unusual. (*Id.* at pp. 715, 719–732.) Although the defendant (like Bailey) had no prior history of sexual crimes, the court found that fact insufficient to support his claim of cruel and/or unusual punishment. (*Id.* at p. 725.)

As noted in *People v. Christensen* (2014) 229 Cal.App.4th 781, 806, subjecting a child to a lewd act "may have lifelong consequences to the well-being of the child." That recognition is part of the reason our state has a policy of imposing greater punishment on persons who commit sexual offenses on children under the age of 14. (*People v. Olsen* (1984) 36 Cal.3d 638, 647–648.) We disagree with Bailey's apparent suggestion that we can (or should) reasonably infer anything about the propriety of the sentence from the absence of M.T. and his family at Bailey's sentencing hearing. They could reasonably have concluded that subjecting M.T. to further contact with

27

Bailey or having M.T. present a victim impact statement in court would further traumatize the boy.

Finally, the facts that Bailey had no prior convictions and a defense expert opined he has no unnatural sexual interest in children does not alter our analysis. In *Baker, supra*, 20 Cal.App.5th 711, the court rejected a similar contention: "Although Baker's insignificant criminal record and low recidivism score point in his favor, his three separate sexual offenses against A.D. and abuse of trust against a vulnerable victim do not." (*Id*. at p. 733.) The same holds true here.

*C. Comparison of the Penalty with Others Imposed in California and Other Jurisdictions*

Bailey does not attempt to argue the 15-year term mandated by Penal Code section 269, subdivision (b) is extreme compared to the punishment imposed for other offenses in California and to the punishments for similar crimes in other states. We interpret Bailey's failure to undertake these analyses "'as a concession that his sentence withstands [these] constitutional challenge[s].'" (*People v. Reyes* (2016) 246 Cal.App.4th 62, 89–90.)

V.

CUMULATIVE ERROR

Finally, Bailey contends the cumulative prejudice of the alleged errors compels reversal of his conviction. We disagree. "In examining a claim of cumulative error, the critical question is whether defendant received due process and a fair trial." (*People v. Sedillo* (2015) 235 Cal.App.4th 1037, 1068.) Our review of the record assures us that Bailey received due process and a fair trial. As discussed above, the evidence regarding C.M. was admissible under section 1108 and there was no reasonable probability the

28

jury would have reached a decision more favorable to Bailey absent the errors in the jury instruction that we have identified.

DISPOSITION

The judgment is affirmed.


GOODING, J.

WE CONCUR:


SANCHEZ, ACTING P. J.


MOTOIKE, J.